IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TERESA DE LUCA            :        CIVIL ACTION
                          :
        v.                :
                          :
TRUSTEES OF THE UNIVERSITY :
OF PENNSYLVANIA           :        NO. 10-5919

MEMORANDUM

Dalzell, J.                              November 30, 2011

Teresa De Luca ("De Luca") brings this suit against her former employer, the Trustees of the University of Pennsylvania ("Penn" or "the University"), alleging violations of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq. ("FMLA"). De Luca specifically alleges that Penn interfered with her rights under the FMLA and retaliated against her for availing herself of her FMLA-protected rights.

Penn has filed a motion for summary judgment, to which De Luca has responded and as to which Penn filed a reply. For the reasons set forth below, we will grant the University's motion for summary judgment.

I.   **Factual Background**

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support

that assertion with specific citations to the record." <u>Bello v. Romeo</u>, 424 F. App'x 130, 133 (3d Cir. 2011).

We will thus begin by reciting the undisputed facts in this matter and then consider the disputed facts that the parties have supported with specific citations to the record.  In so doing, we will keep in mind that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment," <u>Smith v. City of Allentown</u>, 589 F.3d 684, 693 (3d Cir. 2009), and that we should not credit statements in affidavits that "amount[] to (I) legal argument, (ii) subjective views without any factual foundation, or (iii) unsupported assertions made in the absence of personal knowledge." <u>Reynolds v. Dep't of Army</u>, 2011 WL 2938101, at *2 (3d Cir. 2011).

The parties agree on the essential details of De Luca's employment history with Penn.  Since the parties allege many facts that are not relevant to our analysis, we will detail only those facts that pertain to our decision in addition to those essential to providing background information.

In December of 2007, Penn hired De Luca as the Interim Patron Services Manager at the Annenberg Center.  Pl.'s Opp'n Mot. Summ. J. Ex. A at 38:1.  Several months later, De Luca prepared her resume and applied for the permanent position.  Penn hired de Luca as the permanent, full-time Patron Services Manager

in March of 2008.  <u>Id.</u> at 36:11-15.  Her interim and full-time job duties and responsibilities were the same.  <u>Id.</u> at 37:3-5. De Luca was responsible for hiring the front of house staff, training the staff, budgeting concession sales, implementing and maintaining safety and security policies, and event scheduling. <u>Id.</u> at 36:16-37:5.

Madison Cario, the Annenberg Center's Director of Operations, was De Luca's supervisor.  <u>Id.</u> at 56:4-17.  It is disputed whether Cario ever expressed any concerns about De Luca's job performance prior to De Luca's expressed need for any type of FMLA leave.  <u>Compare</u> Pl.'s Opp'n Mot. Summ. J. Ex. E ¶ 1 (De Luca Declaration) <u>with</u> Pl.'s Opp'n Mot. Summ. J. Ex. H at 36:19-24, 38:17-22, 44:24-45:3 (Cario Deposition).  De Luca's 2009 performance evaluation noted that she "consistently meets and frequently exceeds all of the established goals, expectations."  Pl.'s Opp'n Mot. Summ. J. Ex. H at 45:4-17 (Cario Deposition).  In a January 28, 2010 email, Cario thanked De Luca for her "flexibility and . . . ability to pull everything off at the 11th hour."  <u>Id.</u>, Ex. E ¶ 2.  No other Annenberg Center executive or Human Resources representative ever recorded any issue with De Luca's job performance.  Pl.'s Opp'n Mot. Summ. J. 5.  In De Luca's 2010 evaluation, she was rated as "meet[ing]

established goals/expectations for the position." Id., Ex. H at 40:17-22.

On February 16, 2010, De Luca discussed her intention to take FMLA leave with Cario for the purpose of adopting her as-yet-unborn daughter. Id., Ex. A at 85:1-24-86:13. The next day De Luca spoke with Stuart Jasper, the Annenberg Center's Director of Finance and Administration, and said that she needed to take intermittent leave because she was adopting a child. Jasper stated that he would prepare the paperwork. Id. at 87:1-24-88:1-9. At this time, the to-be-adopted child's mother was expected to deliver on March 26, 2010. Id. at 88:19-22.

On March 1, 2010, De Luca advised Cario that her to-be-adopted child's expected delivery date would be on March 15, 2010. Id. at 90:12-19. She emailed Cario and Jasper and informed them that she had not yet received any word on her FMLA leave and she needed it to be processed. Id. Cario consulted with Susan Curran, the Human Resources Director for Provost Administrative Affairs. Curran advised Cario that she should ask for a more definitive schedule from De Luca. Id., Ex. K at 8:5-15, 16:14-24-17:1-2. Curran also reported that the University does not maintain guidelines for approving or disapproving proposed intermittent leave schedules. Id. at 17:7-12.

When De Luca's adopted child was born on March 15, 2010, the baby was found to be addicted to opiates.  Id., Ex. A at 156:19-21.  De Luca told Cario, Jasper, and Curran that her adopted child had this addiction.  Id. at 180:22-181:8.  De Luca also testified that she told these people nothing beyond that. Id. at 181:3-8.  No one from the University ever asked for any documentation regarding the adopted child's condition.  Id. at 175:21-176:1.

De Luca took one full week of FMLA leave following her adopted child's birth.  On March 10, 2010 she received a letter from Penn regarding the status of her FMLA leave request.[1]  Id., Ex. M.  That letter stated:

> On March 8, 2010, you notified us of your
> need to take family/medical leave due to the
> birth of your child by adoption.  You
> notified us that you need this leave
> beginning on March 18, 2010 and that you
> expect the leave to continue until March 29,
> 2010, after which you will begin intermittent
> FML for 4 weeks (return date TBD).  In order
> for your request to be reviewed, you are
> required to provide appropriate
> certification.  Failure to provide such
> documentation may result in the delay or
> denial of your request.  The University is

---

[1]  De Luca misconstrues this letter as "confirmation" that her request for intermittent leave was granted.  Pl.'s Opp'n Mot. Summ. J. at 8.  As the above excerpt of the letter shows, Penn only provisionally designated the leave as FMLA leave and Penn notified De Luca of her need to "provide appropriate certification."  We do not consider this a disputed fact since the record is unambiguous on this point.

> provisionally designating this as Family
> Medical Leave to be effective as of the date
> you are out of the workplace.

Id.  The letter also referenced Penn's Human Resources Policy No.
631 governing the University's FMLA policies and provided a Web
link from which one could access the policy.   Id.

On March 22, 2010, De Luca's adopted child was
discharged from the hospital, id., Ex. A at 156:15-18, and the
child was later under the care of Dr. William McNett of Jefferson
Pediatrics.[2]  A week later, upon De Luca's return from her one
week of FMLA leave, Cario told her that her prior intermittent
leave request had been denied by the University because of the
Center's schedule.  Id. at 140:11-23, 141:22-142:23. De Luca then
"notified Cario and . . . Jasper . . . and requested intermittent
leave to care for [her] daughter. [She] was immediately turned
down." De Luca's prior deposition testimony contradicts the
existence of any request to care for her daughter.  De Luca noted
on two separate occasions that she only requested FMLA leave
"[f]or the adoption of my daughter." Id., Ex. A at 83:24-84:24
(emphasis added).  In addition, when she was asked the "reason
[she]. . . ma[d]e the request of intermittent leave," De Luca

_____

[2]  Dr. McNett authored a report on April 8, 2011
detailing the child's birth, diagnosis, and later treatment.
Pl.'s Opp'n Mot. Summ. J. 10, Ex. E. ¶ 3.

again answered "[i]t was the adoption." Id. at 158:7-13.  When
De Luca was asked if there was "[a]ny other reason" for her
requested intermittent leave, she responded, "No." Id. at 84:3-
12.

On March 30, 2010, in an email to Cario and Jasper, De
Luca sought a reduced thirty-hour per week schedule in the form
of intermittent leave.  Pl.'s Opp'n Mot. Summ. J. 12.  On April
7, 2010, Cario advised De Luca that she could not approve the
requested revised schedule as it did not meet the Annenberg
Center's needs.  Cario thus advised De Luca that her request had
been denied. Id.  Neither Cario, Jasper, Curran, or anyone else
asked or advised De Luca to obtain documentation from a health
care provider.  Id., Ex. E ¶ 4.

At one point, Cario proposed another intermittent
schedule to De Luca, but it required fixed hours. Id., Ex. A at
144:10-19.  Cario's proposed schedule was not congenial for De
Luca, id. at 159:4-22, and on April 29, 2010, De Luca advised
Jasper that she could not continue to work under the current
circumstances and requested continuous FMLA leave. Id.  De Luca
received a letter the next day provisionally granting her request
for continuous FMLA leave beginning on May 7, 2010 pending De
Luca's submission of "appropriate certification." Id., Ex. S.

De Luca was out on continuous FMLA leave for eleven weeks -- until July 26, 2010. Id., Ex. A at 197:23-198:!5. Upon De Luca's return to work, Cario presented her with a document entitled "Annenberg Center for the Performing Arts Expectations for the Patron Services Manager" (the "job expectations document"). Id., Ex. T. At a meeting on her return date, De Luca stated that the job expectations document gave her many new job responsibilities. Id., Ex. H at 55:8-11.

Between July 26 and July 29, 2010, De Luca came to work and did what she was required to do under the job expectations document. Id., Ex. A at 250:20-251:3. On July 29 a meeting took place among Cario, Jasper, De Luca, and Swartz at the Provost's Office to review the job expectations document. Id. at 222:14-19. At this meeting, De Luca expressed her concerns about the job expectations document. Pl.'s Opp'n Mot. Summ. J. 21. She stated that she did not think she could fill the expectations the document outlined. De Luca concluded the meeting by saying that she felt that Penn was not working to try to find a resolution to her concerns. Id., Ex. A at 246:10-247:2, 250:4-11. Later that day, De Luca submitted a letter resigning as Patron Services Manager. Id. at 254:1-18.

## II. **Analysis**

On a motion for summary judgment, "[t]he moving party first must show that no genuine issue of material fact exists," Adderly v. Ferrier, 419 F. App'x 135, 136 (3d Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)), whereupon "[t]he burden then shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial." Id. "'A disputed fact is "material" if it would affect the outcome of the suit as determined by the substantive law,'" J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 2011 WL 2305973, at *6 (3d Cir. 2011) (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)). A factual dispute is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff." Bialko v. Quaker Oats Co., 434 F. App'x 139, 141, n.4 (3d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)) (bracketed material in original). As already noted, we "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." Eisenberry v. Shaw Bros., 421 F. App'x 240, 241 (3d Cir. 2011) (quotation marks omitted).

In addition, our Court of Appeals has recently reaffirmed the "continued vitality and importance" of the sham affidavit doctrine.  Jiminez v. All American Rathskeller, Inc., 503 F.3d 247 (3d Cir. 2007).  Judge Smith's opinion for the Court noted that:

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment.  A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant.

Id. at 253.  Our Court of Appeals embraces a "flexible" approach to the doctrine, noting that not all contradictory affidavits are necessarily shams.

Our Court of Appeals has formulated this sham affidavit analysis standard as follows: "'[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit.'" Id. at 254 (quoting Baer v. Chase, 392 F.3d 609, 625 (3d Cir. 2004).  This corroborating evidence "may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition." Id. In addition, an affiant is given an opportunity to offer a

"satisfactory explanation" for the conflict between a subsequent affidavit and prior deposition.  <u>Id.</u>  But "[w]hen a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition." <u>Id.</u>

### A.   Plaintiff's "Sham" Statement in Her Subsequent Declaration

Paragraph three of De Luca's post-discovery affidavit, Pl.'s Opp'n Mot. Summ. J. Ex. E, ¶ 3, contained in De Luca's unsworn and un-notarized declaration signed on June 3, 2011,[3] constitutes a "sham" under this jurisprudence.  Thus, we will disregard it in our summary judgment analysis.

We arrive at this conclusion for three reasons.  First, De Luca's deposition was taken on March 24, 2011 -- over two months <u>before</u> De Luca wrote her declaration.  As stated in the Factual Background section, De Luca twice testified, under oath, that she <u>solely</u> requested intermittent leave because of the adoption of her daughter.  But two months later De Luca abruptly

_____

[3] Because we decide this particular question on other grounds, we do not reach the question of whether plaintiff's declaration contains inadmissible hearsay statements.  We also note the possibility, without deciding the question, that plaintiff's declaration is deficient for failing to comply with 28 U.S.C. § 1746.

changed her story, and, with no citation to any corroborating factual evidence in the record, she attempted to manufacture a genuine issue of material fact.  Second, since De Luca cannot identify any corroborating evidence, she cannot establish that she was somehow "understandably mistaken" or not in possession of all the facts during her deposition.  Only De Luca knew what her reason was for seeking intermittent leave, and her prior testimony twice unequivocally answered that question.  Third, De Luca has not offered any explanation -- let alone a satisfactory one -- for the conflict between her subsequent affidavit and her prior deposition.  Thus, we will not here consider paragraph three of her June 3, 2011 declaration.

**B.   Plaintiff's FMLA Interference Claim**

**1.   The Interference Standard**

De Luca claims that the University interfered[4] with her right to FMLA leave under § 2612(a)(1)(C) since Penn denied her request for intermitted FMLA leave even though she requested leave to care for her adopted child who was suffering a serious health condition.  Section 2612(a)(1)(B)-(C) details some of the employee "rights" that the FMLA protects:

---

[4] FMLA interference arises under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

12

> [A]n eligible employee shall be entitled to a
> total of 12 workweeks of leave during any 12-
> month period for one or more of the
> following:
> ***
> (B) Because of the placement of a son or
> daughter with the employee for adoption or
> foster care.
> (C) In order to care for the spouse, or
> a son, daughter, or parent, of the employee,
> if such spouse, son, daughter, or parent has
> a serious health condition.[5]

Though the statute and its implementing regulations allow for both continuous and intermittent leave, different statutory provisions, rules, and regulations apply to the use of each category of leave.  Intermittent leave -- the category of leave De Luca alleges Penn interfered with -- may be requested pursuant to § 2612(b) which provides that:

> Leave under [§ 2612(a)(1)(B)] shall not be
> taken by an employee intermittently or on a
> reduced leave schedule <u>unless</u> the employee
> and the employer of the employee agree
> otherwise. . . . [L]eave under [§
> 2612(a)(1)(C)] . . . may be taken
> intermittently or on a reduced leave schedule
> <u>when medically necessary</u>.[6] (emphasis

---

[5] "Serious health condition" is defined by 29 U.S.C. § 2611(11) as: "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider."  "Continuing treatment" is further defined in 29 C.F.R. § 825.115.

[6] Furthermore, the FMLA provides that for leave taken under § 2612(a)(1)(C):

> An employer may require that a request for
> leave . . . be supported by a certification
> [1] issued by the health care provider of the

added) (footnote added)

The Fourth Circuit has summarized these provisions and distilled them into this rule:

> [E]mployers may, at their option, require that employees take FMLA leave for certain reasons (birth, adoption or foster care placement under § 2612(a)(1)(A)-(B)) in one block of up to twelve weeks rather than intermittently.  The requirement that employer and employee must "agree" on intermittent leave means that employers can refuse to allow this type of leave in birth, adoption and foster care placement cases.  By contrast, employees have an unfettered right to take FMLA leave because of a serious health condition intermittently when

> ─────────────

> eligible employee or of the son, daughter, spouse, or parent of the employee, or of the next of kin of an individual in the case of leave taken under such paragraph (3), as appropriate. [2] The employee shall provide, in a timely manner, a copy of such certification to the employer.

§ 2613(a) (footnote added).  Section 2613(b) lays out the FMLA requirements for "sufficient certification."

Defendant-employer Penn requires that leave requested under § 2612(a)(1)(C) be supported by a certification.  Policy No. 631, effective since April 1, 2009, states in pertinent part:

> If FMLA leave is based on a serious health condition, whether it involves the employee or a family member (parent, spouse/same-sex domestic partner or child), medical certification from a health care provider will be required.  Failure to provide such certification may result in a delay of the employee's leave. . . . Please contact your supervisor or the Division of Human Resources for available medical certification forms.

Penn Policy No. 631; Family and Medical Leave Act (FMLA), http://www.hr.upenn.edu/policy/policies/631.aspx.

14

> "medically necessary," with or without
> employer consent.

Dotson v. Pfizer, Inc., 558 F.3d 284, 293 (4th Cir. 2009); see also Maynard v. Town of Monterey, Tennessee, 75 F. App'x 491, 493 (6th Cir. 2003).

Our Court of Appeals has also commented on the FMLA interference cause of action in Sommer v. The Vanguard Group, 461 F.3d 397, 399 (3d Cir. 2006):

> To assert an interference claim, "the employee only needs to show that [1] he was entitled to benefits under the FMLA and [2] that he was denied them."  Callison, 430 F.3d at 119 (citing 29 U.S.C. §§ 2612(a), 2614(a)). "Under this theory, the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision."  Id. at 119-120.  "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  Id. at 120.  Because the FMLA is not about discrimination, a McDonnell-Douglas burden-shifting analysis is not required. See Parker v. Hahnemann Univ. Hosp., 234 F. Supp. 2d 478, 485 (D.N.J. 2002) (citing Hodgens v. Gen'l Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998)).

Id. at 399.

The Fourth Circuit summarized this same principle when it wrote that "it is the employer's responsibility to determine the applicability of the FMLA and to consider requested leave as FMLA leave."  Dotson, 558 F.3d at 293.  And in Cavin v. Honda of America Manufacturing., Inc., 346 F.3d 713, 719 (6th Cir. 2003),

the Sixth Circuit fleshed out the list of elements required to mount an FMLA interference claim, unpacking our Court of Appeals's use of the term "entitlement":

> To prevail on an interference claim, a plaintiff must establish that (1) he is an "[e]ligible employee," 29 U.S.C. § 2611(2); (2) the defendant is an "[e]mployer," 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee FMLA benefits to which he was entitled.

Our analysis of De Luca's interference claim primarily focuses on the fourth element listed above.[7]

Although the FMLA imposes a burden on the employer to investigate additional information as necessary to confirm the employee's entitlement, this duty is only triggered if the employee provides proper notice to her employer. If the need for the leave is foreseeable, then an employee seeking leave under § 2612(a)(1)(C) "shall provide the employer with not less than 30 days' notice, before the date the leave is to begin . . . except that if the date of the treatment requires leave to begin in less

---

[7] In <u>Sarnowski v. Air Brooke Limousine, Inc.</u>, 510 F.3d 398, 401 (3d Cir. 2007), our Court of Appeals noted that "the District Court was correct that, for [an employee] to have been entitled to benefits under § 2612(a)(1)[C] . . . he must have provided notice to [employer] of his need for leave." Thus, the Sixth Circuit's rehearsal of the elements appropriately teases this aspect out of our Court of Appeals's use of the word "entitlement."

than 30 days, the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B); 29 C.F.R. § 825.302(a).

Our Court of Appeals in <u>Sarnowski</u> spoke to the issue of sufficient employee FMLA notice. <u>Sarnowski</u>, cited above in note 7, involved an employee who did not dispute that he was required to provide his employer with notice. The central question in the decision was whether the employee in fact provided legally sufficient notice to entitle him to FMLA benefits. Our Court of Appeals surveyed the "notice standards" the Fifth and Sixth Circuits adopted, and set a "reasonableness" standard of its own:

> In providing notice, the employee need not use any magic words. The critical question is how the information conveyed to the employer is reasonably interpreted. An employee . . . [must] provide[] his employer with <u>reasonably adequate information under the circumstances to understand that the employee seeks leave under the FMLA.</u>

510 F.3d at 402 (emphasis added) (citing <u>Brenneman v. MedCentral Health Sys.</u>, 366 F.3d 412, 421 (6th Cir. 2004) and <u>Manuel v. Westlake Polymers Corp.</u>, 66 F.3d 758, 764 (5th Cir. 1995)). Our Court of Appeals also noted that "courts have found notice to be deficient . . . [where] the employee failed to convey the reason for needing leave." <u>Id.</u> at 403.

The Seventh Circuit in <u>Aubuchon v. Knauf Fiberglass GMBH</u>, 359 F.3d 950 (7th Cir. 2004) (Posner, J.), also addressed the adequacy of an employee's notice. It noted that "[c]onditioning the right to take FLMA leave on the employee's

giving the required notice to his employer is the quid pro quo
for the employer's partial surrender of control over his work
force." Aubuchon, 359 F.3d at 951-52.  Judge Posner's opinion in
Aubuchon explains that the employee has a two-fold notice
obligation: the employee must (1) demand FMLA leave, and (2)
supply the employer with a reason to believe that the employee is
entitled to such leave, unless the employer already knows that
the employee has an FMLA-authorized ground for such leave.  Id.
at 952; see also Hayduk v. City of Johnstown, 580 F. Supp. 2d
429, 455-56 (W.D. Pa. 2008) (citing Aubuchon extensively), aff'd,
386 F. App'x 55 (3d Cir. 2010) (citing Aubuchon), cert denied,
131 S.Ct. 1002 (2011).

> Aubuchon specifically holds that:
>
>> [T]he employee's duty is merely to place the
>> employer on notice of a probable basis for
>> FMLA leave.  He doesn't have to write a brief
>> demonstrating a legal entitlement.  He just
>> has to give the employer enough information
>> to establish probable cause, as it were, to
>> believe that he is entitled to FMLA leave.
>> That is enough to trigger the employer's duty
>> to request such additional information from
>> the employee's doctor or some other reputable
>> source as may be necessary to confirm the
>> employee's entitlement.  29 C.F.R. §§
>> 825.302(c), 825.303(b), 825.305(d)[.]

Id. at 953.  The court must thus treat the employee's demand for
leave and the substance of that demand as two necessary
conditions for adequate notice to trigger the employer's duty to
engage in further investigation.  Id. at 952-53 (collecting cases

18

from the Fifth, Sixth, Seventh, and Eleventh Circuits in support of this proposition).

Aubuchon persuasively explains that "most leaves requested by employees are not based on a ground entitling them to leave under the FMLA, so that if [merely demanding leave without stating a reason] were accepted [as the standard for an employee's notice-giving obligation,] the consequence would be to place a substantial and largely wasted investigative burden on employers." Id. at 953. Aubuchon also cautions that "[e]mployees should not be encouraged to mousetrap their employers by requesting FMLA leave on patently insufficient grounds and then after the leave is denied obtaining a doctor's note that indicates that sufficient grounds existed, though they were never communicated to the employer." Id.

Given this framework for an FMLA interference claim, the jurisprudence stresses that an employee must give her employer adequate notice of her intent to take leave in order to satisfy an essential element of an FMLA interference claim. Thus, we proceed to a discussion of De Luca's interference claim with our attention focused on the adequacy of De Luca's notice to the University about her alleged desire to take leave predicated on the care of her adopted child who had a serious health condition.

## 2.   Plaintiff's Interference Argument

Plaintiff premises her FMLA interference claim on Penn's failure to provide "De Luca with the intermittent FMLA leave she requested after she returned from one week of FMLA leave . . . when Defendant knew that her newborn suffered from an opiate addiction and she could not work a full-time schedule as a result of the need to care for her daughter."  Pl.'s Opp'n Mot. Summ. J. 34.  De Luca contends that since her request for intermittent leave was predicated on her need to care for her adopted child given the child's "serious health condition," it was not within the University's discretion to reject the requested leave as it should have been granted as a matter of right.  <u>Id.</u> at 35.  Since Penn did not grant De Luca's intermittent leave request -- made after the adopted child was born, and after De Luca had allegedly identified to Penn that the child was suffering from opiate withdrawal -- De Luca argues that Penn interfered with her FMLA right to intermittent leave.  <u>Id.</u> at 13.  De Luca also asserts that "[d]espite knowing about her situation [and her daughter's illness], no one from the University ever asked for any documentation regarding [her daughter's] serious medical condition."  <u>Id.</u> at 8.

Using <u>Sarnowski</u> and <u>Aubuchon</u> as guides, we must determine whether De Luca gave Penn the required notice that she was requesting FMLA leave to care for her adopted child who had a serious health condition.  Such notice would trigger Penn's duty

20

to request additional information from the employee's doctor or some other reliable source.

### 3.   **Application**

De Luca's claim of FMLA interference fails as a matter of law because she did not provide the University with the requisite employee FMLA notice.  De Luca's demand for FMLA leave was not predicated on her need to care for a child with a serious health condition.  Rather, she merely stated that her child suffered from a condition and did not supply <u>any</u> additional information about the child's need for continuous treatment or her concomitant need to be present for such treatment.  Absent such information, Penn could not interpret the available information and reasonably glean that De Luca was properly seeking leave under the FMLA.  <u>See</u> <u>Sarnowski</u>, at 510 F.3d at 402; <u>Abuchon</u>, 359 F.3d at 953.  Since De Luca failed to provide her employer with the required notice, she did not satisfy her FMLA employee notice obligation.  She therefore failed to satisfy an essential element of her interference claim and thus that claim cannot withstand the University's motion for summary judgment.

### a.   **Plaintiff Misconstrues the Employee Notice Obligation**

De Luca conflates her FMLA notice obligation with the need to provide a qualifying certification.  She cites <u>Aubuchon v. Knauf Fiberglass</u>, 359 F.3d 950, 953 (7th Cir. 2004), <u>Lincoln</u>

v. Sears Home Improvement Prods., No. Civ. 02840DWFSRN, 2004 WL
62716 (D. Minn. Jan. 9, 2004), Peter v. Lincoln Technical Inst.,
Inc., 255 F. Supp. 2d 417, 441 (E.D. Pa. 2002), and 29 C.F.R. §
825.208(e)(2),[8] for the proposition that once an employee makes a
request for leave that could be construed as FMLA qualifying, it
is the employer's duty to "'make a preliminary designation'" of
FMLA eligibility and, if necessary, "'request such additional
information from the employee's doctor or other reputable source
as may be necessary to confirm the employee's entitlement.'"
Pl.'s Opp'n Mot. Summ. J. at 35.  And she contends that Penn
mistakenly placed the burden on her to provide a health care
certification when it could and should have initiated the request
for a health care provider's certification.  Id. at 36.[9]  De
Luca's argument puts the cart before the horse.

     As our discussion of an employee's FMLA notice
obligation makes plain, an employer's investigatory obligation is
not automatically triggered by any employee action that the
employee subjectively conceives to be sufficient notice.  This
would be, as the Seventh Circuit persuasively held, an automatic
trigger that "would . . . place a substantial and largely wasted

---

     [8] As the Department of Labor has expressly reserved §
825.208 of the regulations, and thus it contains no operative
language, plaintiff's citation to this phantom regulation remains
a mystery to us.

     [9] This is a question that we do not reach because we
decide De Luca's interference claim on another basis.

investigative burden on employers." Aubuchon, 359 F.3d at 953.
Thus, De Luca's reading of Lincoln, Peter, and Aubuchon overlooks
the crucial role that an employee's notice obligation plays in
surviving a motion for summary judgment.  To be sure, Lincoln
and Peter both hold that the employee satisfied the employee FMLA
notice requirement, thus activating the employer's duty to
conduct further research.  See Lincoln, 2004 WL 62716, at *5-6;
Peter, 255 F. Supp. 2d at 440 (finding sufficient notice largely
because employer was acutely aware that the employee had stopped
working at employer's behest "for the purpose of seeing a medical
professional about [the employee's] 'illness'[.]").  By contrast,
here we are called upon to determine whether, at the threshold,
De Luca provided Penn with adequate FMLA notice that she sought
to take FMLA leave to care for her child and not solely for the
adoption of that child.

      **b.**   **Plaintiff Failed to Provide Required Notice**

A close analysis of Sarnowski, the cases it cites, and
the Seventh Circuit's opinion in Aubuchon illuminate the contours
of an employee's notice obligation under the FMLA.  These cases
teach why De Luca failed to satisfy her end of the FMLA quid pro
quo.

In Sarnowski, our Court of Appeals found that the
employer had sufficient notice of the employee's intent to take
FMLA leave such that the employer was barred from interfering

with his FMLA rights because the employee had previously: (1)
missed about six work weeks for quintuple coronary artery bypass
surgery and his employer was aware of the reason for his absence;
(2) informed his supervisor of his "need for monitoring and
possible additional surgery"; and (3) "made it clear to his
employer that his health problems were continuing."  510 F.3d at
403.

        More to the point, our Court of Appeals also noted that
other Courts of Appeals have found that employers did not have
sufficient notice of an employee's intent to take FMLA leave
where an employee: (1) "never informed his supervisor of a
serious medical condition," see Seaman v. CSPH, Inc., 179 F.3d
297, 302 (5th Cir. 1999); (2) "did not explain that his absence
had been due to a serious medical condition until after the
fact," see Brenneman, 366 F.3d at 423-24; and (3) "expressed that
he was stressed and felt his health was at risk but never
provided any information to indicate that his absence from work
was due to a serious health condition," see Woods v.
DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005),
Sarnowski, 510 F.3d at 403.

        In addition, the Seventh Circuit in Aubuchon held that
an employer did not have sufficient notice that his employee
intended to take FMLA leave where the employee orally and in
writing expressed his desire to take leave solely under the FMLA

24

without citing any reason for the leave apart from wanting to stay home with his wife until she gave birth.  359 F.3d at 952. The Seventh Circuit noted that the employee made no reference to his wife's pregnancy complications, false labor, or any other serious health condition as a reason for the leave.  Id.  The panel also held that a demand for leave that did not specify an FMLA-leave qualifying reason did not put the employer on notice of the FMLA-requested leave.  Consequently, the employer's duty to request additional information from the employee's doctor or some other authoritative source was not triggered.[10]  Id. At 953.

Four reasons confirm that De Luca did not offer sufficient notice of her intent to take FMLA leave predicated on her need to care for her child who was allegedly battling a serious health condition.[11]

---

[10]  The Seventh Circuit also found it suspect that it was not until the employee was fired that he produced a note from his wife's doctor citing complications in her pregnancy -- and the court took pains to point out that "employer has . . . a right to be notified . . . as soon as practicable" of the reason for the requested leave, which the court found came "too late" in this case.  Id. at 952-53.  The court also found that the employee's wife's ailments did not rise to the level of a serious health condition within the meaning of the statute and applicable regulations.  29 U.S.C. § 2611; 29 C.F.R. §§ 825.112(c), 825.114(a)(2)(ii).  Because we decide De Luca's interference claim on another basis, we do not reach the question of whether the adopted child's condition constituted a "serious health condition" under the FMLA.

[11]  For purposes of this analysis, we will assume arguendo that De Luca offered a satisfactory "serious health condition".

25

First, there is no dispute that De Luca herself twice testified under oath that she sought intermittent leave only because of the recent adoption. It is undisputed that De Luca never mentioned her adopted child's alleged serious health condition as a reason for her requested intermittent leave. Pl.'s Opp'n Mot. Summ. J. Ex. A at 83:24-84:24, 158:7-13. De Luca cannot point to any evidence in the record to suggest that she ever demanded leave on the ground of her need to care for her child because of the child's medical condition. Since De Luca never expressly requested leave on this basis, the University cannot be liable for interfering with FMLA rights that De Luca never put into play. Unlike the employee in Sarnowski who affirmatively invoked his need for FMLA leave predicated on his ongoing serious health condition, De Luca took no such affirmative step to invoke her alleged need to care for her adopted child with a serious health condition. Where Aubuchon found an employee's failure to state a reason fatal to his otherwise bald demand for leave, De Luca's claim is flawed for the inverse reason that she proffered a ground for leave without ever demanding leave on that ground.

Second, it is not contested that De Luca's deposition testimony alleges that she only told Penn that her child "was born addicted to opiate" without further informing her employer of the type of care or medical treatment the child needed. Id.

26

at 181:5-12.  It is also uncontroverted that, according to De
Luca, the University only "learn[ed] of [her] daughter's
illness," and nothing more.  Id. at 177:14-16.  De Luca's
testimony is consistent with Cario's unchallenged deposition
testimony that she did not know that the child was suffering any
health issues after being released from the hospital.  Id., Ex. H
at 27:11-14.  Thus, unlike the employer in Sarnowski, Penn had no
knowledge of the child's treatment regimen because De Luca never
gave her employer any details about the child's condition.  Thus,
the University had no basis upon which it could reasonably infer
De Luca's need to take FMLA-leave to care for her child.

　　　　Third, the employer in Sarnowski knew that the
employee's chronic heart problems and prior surgery greatly
increased the likelihood that the employee might need FMLA leave.
But here the University had no such antecedent knowledge to guide
its understanding of De Luca's FMLA needs.  De Luca's deposition
testimony reveals, and it is not in dispute, that De Luca
repeatedly sought intermittent leave because of the recent
adoption of her child and not for any other reason supported in
fact.  Id., Ex. A at 83:24-84:24, 158:7-13.  Penn thus had no
basis to infer that De Luca wanted intermittent leave to care for
her child because all of her previous requests pointed only to
adoption-tethered reasons for leave.

Fourth, the uncontroverted record confirms that De Luca only affirmatively argued that she sought intermittent FMLA leave to care for her adopted child, and presented the functional equivalent of a "doctor's note" to substantiate her claim, <u>after</u> months of negotiations about her discretionary adoption-tethered intermittent leave request.  Notably, this contention followed the exhaustion of her twelve-week FMLA leave allotment, her decision to resign shortly after returning to her job after her eleven weeks of continuous leave, <u>and</u> the initiation of this litigation.  Such <u>post</u> <u>hoc</u> rationalization is exactly what <u>Brenneman</u>, 366 F.3d at 423-24, and <u>Aubuchon</u>, 359 F.3d at 953, explicitly proscribe as "patently insufficient grounds."  It will also be recalled that the Seventh Circuit found that a doctor's note advancing a reason for FMLA-requested leave would have allowed a reasonable employer to understand that the employee might take FMLA leave <u>if</u> that note had been proffered "before the company acted on [the employee's] request for leave."  <u>Id.</u>  The undisputed delay in the timing of De Luca's <u>post</u> <u>hoc</u> claim is fatal under the teaching of the Sixth Circuit in <u>Brenneman</u> and the Seventh Circuit in <u>Aubuchon</u>.

De Luca cannot point to any fact of record that creates a genuine issue as to any of the material facts just discussed. Since De Luca failed as a matter of law to have given Penn the

requisite FMLA notice, her FMLA interference claim must succumb to summary judgment.[12]

### C.   Plaintiff's FMLA Retaliation Claim

#### 1.   The Retaliation Standard

Our Court of Appeals has held that when an FMLA retaliation claim arises *after* a plaintiff-employee has taken FMLA leave, liability must be predicated on 29 C.F.R. § 825.220(c) and *not* §§ 2615(a)(1) or (a)(2).  Erdman v. Nationwide Insurance Co., 582 F.3d 500, 508 (3d Cir. 2009) (citing Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135, 146-47 (3d Cir. 2004)).

FMLA retaliation claims are analyzed using the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting framework.  The first and third steps of the framework are at issue with respect to De Luca's claim that she was not restored to an equivalent position after her return from continuous FMLA leave.  In the first step, plaintiff-employee carries the initial burden of establishing a *prima facie* § 825.220(c) retaliation claim.  McDonnell Douglas, 411 U.S. at

---

[12]   It also bears mention that, at worst, De Luca was on constructive notice of the differences between adoption-based leave requests and serious health condition leave requests because she had access to Penn's online FMLA policy. Furthermore, the contents of the Penn FMLA form letters issued in response to De Luca's FMLA requests directed her to consult this online policy, and these letters also included the warning that the FMLA request must also contain the requisite certification.

802.  For plaintiff-employees to establish <u>prima</u> <u>facie</u> FMLA

retaliation claims arising under § 825.220(c), they must show

that: (1) they took FMLA leave, (2) they suffered an adverse

employment decision, and (3) the adverse decision was causally

related to their leave.  <u>Conoshenti</u>, 364 F.3d at 146.

If a plaintiff succeeds in establishing a <u>prima</u> <u>facie</u>

case, the burden of production shifts to defendant-employer to

"articulate some legitimate, nondiscriminatory reason for the"

adverse employment decision.  <u>McDonnell Douglas</u>, 411 U.S. at 802.

Upon meeting this "relatively light burden," <u>Fuentes v. Perskie</u>,

32 F.3d 759, 763 (3d Cir. 1994), the burden rebounds to

plaintiff.  In this third step, plaintiff-employee bears the

burden of demonstrating that the employer's purported

justification is but a pretext designed to mask discrimination.

Our Court of Appeals has explained that:

> To avoid summary judgment under the third
> step of the <u>McDonnell Douglas</u> framework, the
> plaintiff must "point to some evidence,
> direct or circumstantial, from which a
> factfinder could reasonably either (1)
> disbelieve the employer's articulated
> legitimate reasons; or (2) believe that an
> invidious discriminatory reason was more
> likely than not a motivating or determinative
> cause of the employer's action." <u>Fuentes v.</u>
> <u>Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994). The
> plaintiff must adduce evidence sufficient to
> "allow a factfinder reasonably to infer that
> <u>each</u> of the employer's proffered
> nondiscriminatory reasons was either a <u>post</u>
> <u>hoc</u> fabrication or otherwise did not actually
> motivate the employment action." <u>Id.</u>
> (emphasis in original) (internal citation

omitted).  To do so, the plaintiff must
"demonstrate such weaknesses,
implausibilities, inconsistencies,
incoherencies, or contradictions in the
employer's proffered legitimate reason for
its action that a reasonable factfinder <u>could</u>
rationally find them unworthy of credence and
hence infer that the employer did not act for
[the asserted] non-discriminatory reasons."
<u>Id.</u> at 765 (emphasis in original) (internal
quotations and citations omitted).  It is not
sufficient to show that the employer's
decision was wrong, mistaken, imprudent or
incompetently made.  <u>Id.</u>

<u>DiCampli v. Korman Communities</u>, 257 F. App'x 497, 500 (3d Cir.

2007).


### 2.   <u>Plaintiff's Retaliation Argument</u>

De Luca contends that upon her return from continuous

FMLA leave, Penn, in retaliation for her taking FMLA leave, did

not restore her to an "equivalent position"[13] when it sought to

enforce the "job expectations document."  She alleges that the

creation of the job expectations document constitutes an

actionable "adverse employment decision," § 825.215(a)-(e).  De

Luca also contends that her continuous FMLA leave caused her

employer to render its adverse employment decision.  She also

---

[13] 29 C.F.R. § 825.14 provides, in pertinent part: "On
return from FMLA leave, an employee is entitled to be returned to
the same position the employee held when leave commenced, or to
an equivalent position with equivalent benefits, pay, and other
terms and conditions of employment."

argues that the University's proffered reason for the adverse employment action was "pretextual."[14]

Assuming for argument's sake that the job expectations document was an adverse employment action and all other prima facie case requirements under McDonnell Douglas step one are satisfied, Penn nevertheless asserts that it was justified in taking this action because of "Plaintiff's repeated failure to show up for work during relevant times and perform her supervisory responsibilities." Def.'s Mot. Summ. J. 46. The University also contends that "the job expectations document was a culmination of ongoing conversations with Plaintiff about her attendance issues. . . . [,] that Plaintiff and her supervisor had addressed these concerns before Plaintiff ever revealed her intention to adopt a child, before Plaintiff took her continuous leave" or returned from leave. Id. at 47.

### 3.   Application

---

[14] In Lepore v. Lanvision Systems, Inc., 113 F. App'x 449, 454 (3d Cir. 2004), our Court of Appeals declined to opine on whether the temporal proximity of plaintiff's termination to the end of her maternity leave constituted prima facie causation. Lepore affirmed the district court's grant of summary judgment because plaintiff failed to meet her burden of showing that the employer's reasons for termination were pretextual. See also Constant v. Mellon Financial Corp., 247 F. App'x 332, (3d Cir. 2007) (affirming district court's award of summary judgment because plaintiff failed to adequately show pretext, thus declining to reach district court's finding of lack of causation).

Because De Luca has not "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons[,]" DiCampli, 257 F. App'x at 500, we will grant Penn's motion for summary judgment on her retaliation claim.[15]   In the face of Penn's assertion that De Luca's job expectations document was created because of "Plaintiff's repeated failure to show up for work during relevant times and perform her supervisory responsibilities[.]", Def.'s Mot. Summ. J. 46, De Luca points to no evidence from which a factfinder could reasonably disbelieve Penn's articulated reason and find it to be a pretext designed to mask its alleged discrimination.   There is, quite simply, no issue of material fact as to the University's reason for issuing the job expectations document, see DiCampli, 257 F. App'x at 500, and thus De Luca has not carried her burden at McDonnell Douglas's third step.

At Cario's March 17, 2011 deposition, De Luca was put on notice that Cario had communications with her staff about De

_____

[15] Because we find that De Luca fails to carry her burden under McDonnell Douglas step three, we do not reach the question about her failure to establish her retaliation prima facie case under McDonnell Douglas step one.

Luca during De Luca's continuous leave.  Pl.'s Opp'n Mot. Summ.
J. Ex. H at 57:8-20.  Cario revealed that through these
communications she became aware that De Luca was not working the
hours required for the position.  Id.  Though Cario did not then
identify her sources for this information, plaintiff's counsel
also did not ask her to identify the sources, nor did her counsel
use the remaining two months of discovery to investigate this
issue.

     Nearly three months later -- and only after the
University filed its motion for summary judgment -- De Luca
prepared an unsworn, un-notarized declaration in which she
alleged that (1) "Gill and Pliszka were not pleased with the
discipline" De Luca had administered to them; (2) Jennifer
Silverman and Darlene Rizzo "reported issues and concerns" to De
Luca while she was out on continuous FMLA leave because "Cario
had asked the staff to collect negative information about" her
and report the findings; and (3) "Patrick Appenzeller apologized
to [De Luca] for causing any issues."  Pl.'s Opp'n Mot. Summ. J.
Ex. E ¶¶ 9, 10, 12. Although we will not consider Gill and
Pliszka's declarations,[16] we note that De Luca's comments about

---

[16] Plaintiff calls our attention to the Gill and Plizka
declarations, Pl.'s Opp'n Mot. Summ. J. Exs. J & K, that
defendant relies upon in support of its motion for summary
judgment.  Plaintiff notes that, in contravention of Fed. R. Civ.
P. 37(c), the University did not supplement its initial Rule
26(a) disclosure, Pl.'s Opp'n Mot. Summ. J. Ex. AA, nor did it
supplement its interrogatory responses that identified persons

these two people suggests that they may have had ulterior motives

to report her to Penn.  But De Luca's statement about the

declarants' motives fails to establish any connection to her

request for, or actual taking of, FMLA leave.  Her statement also

---

with knowledge of (1) the facts and circumstances at issue in
this litigation, or (2) persons from whom oral or written
statements may be taken, and (3) persons whom defendant expects
to call as witnesses at trial.  Id. Ex. BB; Pl.'s Opp'n Mot.
Summ. J. 23 n.12.

Penn indeed failed to supplement its initial disclosure
and interrogatory answers.  The University does not attempt to
justify its failure and we find that such a failure was not
harmless to plaintiff because it introduces two specific
declarants that plaintiff might have deposed had these
individuals been properly identified earlier in the litigation.
Since defendant has violated Rule 37(c)(1), it is "not allowed to
use that information [contained in the declarations] . . . to
supply evidence on a motion, at a hearing, or at a trial[.]"
Rule 37(c)(1); cf. Williams v. Morton, 343 F.3d 212, 222-23 (3d
Cir. 2003) (implying district court might have abused its
discretion if it had denied plaintiffs' motion to exclude
affidavit attached to summary judgment reply brief had plaintiffs
not been allowed to depose affiant and amend previously-filed
summary judgment brief, thus mitigating plaintiffs' potential
harm from the admission).

Penn characterizes De Luca's request that we ignore
these affidavits as a "technical defect," Def.'s Reply Mot. Summ.
J. 8.  Though Penn mentioned David Pliszka and David Gill in its
answer to Interrogatory Six, this interrogatory addressed the
individuals who assumed all or some of De Luca's job duties
following the end of her employment, and their inclusion in this
answer does not anticipate the declarations submitted in support
of Penn's motion for summary judgment.

Furthermore, though the University noted that "[s]ome
staff members raised concerns regarding Plaintiff's management
and performance[]" during De Luca's absence from work and that
Cario had "significantly more contact with the staff that
Plaintiff supervised," Pl.'s Opp'n Mot. Summ. J. Ex. BB at
Interrog. 9, Penn then failed to identify Pliszka and Gill as the
sources of this information.  We will not permit any party to
shirk its disclosure obligations under the Federal Rules.  Thus,
we will proceed with our analysis without considering the Gill or
Pliszka declarations.

fails to point to any record evidence that fairly suggests Penn had an ulterior motive.  As our Court of Appeals has taught, even if Penn's decision to rely on Gill and Pliszka's statements was "wrong, mistaken, imprudent, or incompetent," this alone is not enough for De Luca to survive summary judgment on the pretext question at McDonnell Douglas's third step.

Second, even if Cario had asked the staff to collect negative information about De Luca and report back the findings, this does not create an issue of material fact about the employer's proffered reason for generating the job expectations document.  Penn may have asked staff to collect negative information about De Luca, but she does not allege why Cario sought such information.  And this, of course, is the crux of the material issue we are to consider at this step of the analysis. De Luca must demonstrate the flaws in Penn's proffered reason for creating the job expectations document, and she must identify admissible evidence from which a factfinder could reasonably infer that Penn's reason was a post hoc fabrication.  From De Luca's statement about Silverman and Rizzo, a factfinder could not reasonably infer anything about Penn's alleged motivation to create the job expectations document.  The factfinder could only reasonably conclude that Penn had some unidentified reason for wanting to collect negative information.  Since De Luca does not point to record evidence from which a factfinder could reasonably

disbelieve Penn's articulated legitimate reason for drafting the job expectations document, she cannot survive summary judgment.[17]

Furthermore, plaintiff's 2009 performance evaluation, her receipt of a subsequent note of thanks for her efforts, and the dearth of other negative feedback from her prior performance evaluations do not create an issue of material fact about Penn's proffered reason for creating the job expectations document.  A reasonable factfinder would only be able to infer from these documents that Penn perceived a difference in De Luca's job performance between the dates these documents were authored and when Cario presented her with the job expectations document on July 26, 2010.  A reasonable factfinder could not infer from this record that the University's justification in creating the job expectations document was a post hoc fabrication.  De Luca has not proffered any evidence that calls into question the employer's motivation for its creation of a new job expectations document.

In addition, plaintiff's attempt to contrast Penn's treatment of other employees who requested FMLA leave with her own treatment misapprehends our Court of Appeals's inquiry.

---

[17] De Luca's allegation that Silverman and Rizzo were "retaliated" against for not sharing negative information with Penn about her also does not speak to Penn's motive in creating the job expectations document.  Pl.'s Opp'n Mot. Summ. J. Ex. E ¶ 11.  De Luca's statement about Patrick Appenzeller also misses the relevant inquiry of Penn's motive for creating the job expectations document.  Id. ¶ 12.

While De Luca may be correct that she and these employees are "similarly situated," these other employees are <u>not</u> "not within the protected class" because all referenced employees are entitled to the protections of the FMLA.  <u>See</u> <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 645 (3d Cir. 1998).  Thus, De Luca's argument on this point is beside the point.

Plaintiff also argues that during the course of her deposition she disavowed Penn's proffered reason for creating the job expectations document.  Pl.'s Opp'n Mot. Summ. J. 32.  Her difference of opinion has no bearing on our analysis.  First, plaintiff fails to cite any record evidence where she "disavows" Penn's proffered reason.  In her declaration De Luca only notes that Cario had not "discussed any concerns she had with [De Luca's] job performance[]", <u>id.</u> Ex. E ¶ 1, prior to her FMLA leave.  True, De Luca cites her deposition testimony, Pl.'s Opp'n Mot. Summ. J. 21, that references her <u>perception</u> of Penn's reasons for implementing the job expectations document:  "I <u>felt</u> under scrutiny, . . . I <u>felt</u> that the expectations came about in retaliation for me having changed my schedule – or, . . . requested to change my schedule."  <u>Id.</u>, Ex. A at 246:14-18; <u>see also</u> Pl.'s Opp'n Mot. Summ. J. 7 ("De Luca <u>believed</u> that Cario was angry that De Luca had requested a change in her schedule." (emphasis added) (citing Pl.'s Opp'n Mot. Summ. J. Ex. A at 103:22-104:2).  Rule 56 and our Court of Appeals oblige us to

only credit disputes premised on facts in evidence, not disputes
based on one party's subjective perception or "feelings".  See
Bialko, 434 F. App'x at 141 n.4 (citing Williams v. Borough of W.
Chester, 891 F.2d 458, 460 (3d Cir. 1989) ("[A] non-moving party
. . . cannot simply reassert factually unsupported allegations
contained in its pleadings." (alterations in Bialko)).  Indeed,
De Luca cites no admissible evidence of record that questions the
accuracy of the University's proffered reason.  Thus, unlike
Baker-Bey v. Pennsylvania Department of Corrections, No. 06-5490,
2009 WL 3790307, at *8 (E.D. Pa. Nov. 12, 2009), De Luca does not
raise a "dispute . . . as to whether certain violations actually
occurred . . . . [thus] cast[ing] sufficient doubt on the
legitimate reasons proffered by the Defendant, and lead[ing] to
the conclusion that discrimination was a motivating factor in the
adverse employment action."  De Luca does not rebut the
employer's statement that she repeatedly failed to show up for
work during relevant times and perform her supervisory duties.
She only asserts that Penn never raised these issues with her
before her return from FMLA leave.

        De Luca also misconstrues her burden and the relevant
"issue" at play in the third step of the McDonnell Douglas
analysis: a plaintiff must adduce evidence sufficient to allow a
factfinder reasonably to infer that her employer's proffered non-
discriminatory reason was a post hoc pretext.  De Luca does not

point us to any evidence of record as to any flaw in Penn's

proffered reason that is premised on her failure to show up for

work and supervise properly.  In the absence of such evidence, a

reasonable factfinder could not reasonably find Penn's

explanation unworthy of credence or a pretext for discrimination.

No issue of _material_ fact exists as to Penn's motivation or

reason for crafting the job expectations document.[18]

---

[18] De Luca cites _Jalil v. Avdel Corp._, 873 F.2d 701, 709
and n.6 (3d Cir. 1989), to support her argument that "temporal
proximity between the protected activity and the adverse action
may create a fact question alone where the adverse employment
action follows the protected conduct."  Pl.'s Opp'n Mot. Summ. J.
32.  _Jalil_ is distinguishable because our Court of Appeals found
that the "timing of the discharge in relation to [plaintiff's]
EEOC complaint may suggest discriminatory motives on the part of
[defendant]."  873 F.2d at 709.  In _Jalil_, the plaintiff,
president of his union's Local, was initially terminated three
days after he filed his first grievance with his union claiming
that his employer was discriminating against him because of his
union activity.  _Id._ at 703.  After his union interceded, the
plaintiff was restored to his position, and his penalty was
reduced to a three-day suspension.  But plaintiff soon filed
another grievance that remained unsettled, alleging harassment
and discrimination on the basis of national origin and union
activity.  About three weeks later -- on the same day that
plaintiff filed a charge of discrimination with the EEOC alleging
that his employer denied him access to his personnel file and
suspended him for filing a grievance with his union and because
of his national origin -- his employer simultaneously terminated
him.  _Id._ at 703.  Thus, under our Court of Appeals's reasoning,
the temporal proximity of the employer's adverse employment
action to the employee's filing of an EEOC complaint suggested a
discriminatory motive because it was accompanied by record
evidence beyond mere temporal proximity including (1) the sordid
history of tension between employer and employee, including the
employer's own prior questionable termination of the employee,
and (2) the near simultaneity of the employee's filing of the
EEOC complaint and his employer's termination of his employment.
    De Luca neither adduces the same circumstantial
evidence to buttress her temporal proximity claim nor does she

The University has thus shown that there is no issue of material fact as to whether its proffered non-discriminatory reason for giving De Luca the job expectations document was in fact non-discriminatory.  De Luca has not carried her burden on the third <u>McDonnell Douglas</u> step of a FMLA retaliation claim by pointing to items in the record that create genuine issues of material fact.  Her retaliation claim must fail as a matter of law.

BY THE COURT:

\_\_\s\Stewart Dalzell

---

show that Penn's action was simultaneous with her decision to invoke her FMLA rights because De Luca received the job expectations document shortly <u>after</u> her return from an eleven week continuous FMLA leave and <u>not</u> (1) before or immediately after her initial one-week FMLA leave, (2) at any time in between her one-week leave and her eleven week continuous leave, or (3) at any time during her eleven week leave.  Pl.'s Opp'n Mot. Summ. J. Ex. E ¶ 1.  In addition, De Luca alleges no other retaliatory "adverse employment action" during this time period.